Thank you, Your Honor. May it please the Court. Kara Hartzler, Federal Defenders, on behalf of Ms. Ayala-Bello as well as Mr. Vélez-González in these consolidated cases. The question in this case is whether noncitizens charged with a petty offense in the Southern District of California can be arrested, detained, shackled, and convicted, while U.S. citizens charged with petty offenses are not. And the answer is no. No one disputes that Congress can create a crime with an element of alienage, but prosecutors and judges can't use that element to treat people differently during their criminal proceedings. And because that's what happened here, we would ask... Ms. Hartzler? Yes, Your Honor. Can I ask you a quick question on this? So, as I understand it, some of the petty offenses are like too many tickets in a, for example, a park or speeding in a federal property, right? Correct. If a noncitizen had one of those offenses occur, are you maintaining they wouldn't be on the petty offense docket or they would? I don't know, Your Honor, because frankly there is no tracking of citizenship status on the thing. I think it's possible. I think it is possible that a noncitizen could get a ticket and would be put in the petty offense court rather than the... Regular court? Do you have any evidence of the contrary being true? I do not. Okay. Go ahead. I'm sorry. That's fine. And just on that point, Your Honor, there is no tracking of the citizenship status of people who are in the petty offense court versus the regular court who have been charged with petty offenses. And so, because those statistics are impossible to get, they aren't available, something like that would not defeat our equal protection claim under this court's decision in Sellers. So, I'll go ahead and continue. Your Honor, basically here we think that there... Why couldn't they decide, if Congress can properly have alienage as an element of this offense, why can't they decide that in this district, which is a border district, that illegal entry is a particularly serious offense and even though it's a petty offense, given the volume of violators that they see, they need to handle that differently because it presents a different situation from other types of petty offenses. Why isn't that a rational and legitimate basis for drawing a distinction between 1325 and other types of offenses in San Diego? Two responses to that, Your Honor. First of all, it's not Congress doing the disparate treatment here. It's the court and prosecutors. No, but why can't the court and prosecutors draw that distinction, given the statute Congress has given them? Well, because there is, while there may be a rational basis in terms of immigration status, here the plain language of the statute says alienage, and alienage is protected class. So, certainly prosecutors and judges could do things for the sake of efficiency, but they can't treat one class worse than the other. They treat one crime different from another all the time. There are different policies on different types of offenses, and why can't, in a border district, why can't they make a decision that illegal border crossing is going to be handled separately because of the high volume, coupled with the fact that it's a serious problem and there needs to be some measure of deterrence. They could do it, Your Honor, but when the distinction is on the basis of alienage, alienage... No, but it's on the basis of the offense. It's 1325. Correct, but... If it were a basis of alienage, then they'd be doing the other CBB offenses, you know, would be allocated. People would be moved out based on alienage, but that's not what we're seeing. But alienage is an element of the offense, and you can't separate the disparate treatment here from the element of the offense. 1325 is because alienage is an element. It's immune from being given any special treatment. They have to... They're not allowed to treat it as a serious problem? They can certainly treat it as a serious problem, Your Honor, but they can't use a protected class to treat people differently during a criminal proceeding. The fact that Congress can make it a crime and make alienage an element of offense doesn't mean that people get treated differently during the prosecution of that offense. And that goes back to the Supreme Court's decision in Wong Wing. And in that case, the Supreme Court said, yes, Congress can make it a crime for people, a person, a non-citizen, to be in the United States without lawful status. But that is different than saying that a person can be treated differently in the course of those criminal proceedings. For instance, by not having the right to a jury trial or some other due process or equal protection basis. So if they offer diversion for certain crimes, do they have to offer them for 1325? Your Honor, I think if it's a similarly serious offense, there needs to be some similar treatment. And I think the other problem here, Your Honor, is that it's not just that people who are other citizens who are charged with a petty offense are treated differently. It's also that... I'm sorry, Your Honor. I'm sorry. So let's say they say a petty offense is drug possession on federal property. Let's say they say for that we're going to give diversion, which often happens in many districts. Do they have to do it in 1325 as well, in that district? If they're going to offer diversion, and the reason that they're offering diversion to one group but not another is alienage, then they need to do it. But your argument seems to be in response, and I'm sorry to interrupt you. No, I'm sorry. Please, Your Honor. Your argument seems to be in response to Judge Collins' questions that because it has an element of this, you have to treat it a certain way, no matter what. So it actually puts 1325 on like a heightened protection plan. Like they get everything anyone could possibly get. Even if we offer drug possession diversion, but we don't offer, I don't know, we offer marijuana diversion but not cocaine, for example. Or whatever. Or cocaine diversion but not marijuana, for whatever reason. I don't believe all we're asking is that people with alienage be treated the same as other people charged with similarly serious crimes. Now, for instance, take 1326. We're not making an equal protection claim there because people charged with an element of alienage are treated similarly to other felons. All we're asking for is that people be treated to the same and with the same procedures that citizens are. And with your permission, I'll save the remainder of my time for rebuttal. Thank you. Good. Let's hear from counsel for the government. Good morning, your honors. May it please the court. David Schufer, the United States. When an alien enters the United States illegally, arresting that person is not a violation of equal protection. Bringing that person before a magistrate judge is not a violation of equal protection. Encountering that person's case with other like cases for judicial deficiency is not a violation of equal protection. Because the appellants suffer no violation of equal protection at any point in their case, this court should affirm their convictions. Now, the starting point for any equal protection analysis is the level of scrutiny. And that level here is rational basis review. We know this because the Supreme Court has an explicit holding directly on point. This is Plyler v. Doe. And there the Supreme Court held that an alien who enters the United States voluntarily and in violation of federal criminal law, and the Supreme Court specifically cited 1325, that that person is not a part of suspect class. And that is exactly the class that appellants belong to. That is exactly the class that appellants claim is being discriminated against. Is there any offense other than 1325 that is a petty offense, but that there is routinely sent to magistrate court or to district court as opposed to going to the CBB process? Your Honor, the short answer to that is, for the most part, when we're talking about petty offenses, class B misdemeanors or below, generally speaking, a legal entry is the only one that gets processed through arrest, and then after arrest being brought before a magistrate judge. There are some pretty rare exceptions. In some cases, you'll have maritime voyeurism as being an arrest for a misdemeanor. But in general, it is pretty rare. But the point here, Your Honor, is that yes, legal entry is a misdemeanor. And yes, other misdemeanors are processed through the CBB calendar, as Your Honor pointed out, speeding, or as Judge DePauw pointed out, speeding in a national park. But the Supreme Court has said over and over again that the Constitution does not require two things that are different to be treated in law as though they're the same. And so even though we have the misdemeanor of illegal entry, that misdemeanor is not the same as other misdemeanors like the speeding in a national park. It's simply different. And it's different because you're just saying as a categorical matter, the people who commit that offense are differently situated from the people who commit the other petty offenses? No, Your Honor. What we're saying is that the crime itself is different. And again, we can return back to the Supreme Court case in Filer v. Doe. I'm sorry. It's different because, what, it's actually more severe than other petty offenses that are classified at the same level? Or what are you saying? Why is it different? Sure, Your Honor. The difference is that in Filer, the Supreme Court said that an alien who enters the United States illegally, that person's very presence here in the United States is in violation of federal law. And so that is the main difference. That is different than other individuals who commit petty offenses. Again, I'll just use the speeding example. That person, and again, whose ticket would be processed through the CBB doesn't have to be a citizen, as this was pointed out by Judge Tabar, is that person could be a citizen, could be an alien, could be a permanent resident, could be somebody here on a visa. That person is differently situated than an individual whose very presence here is in violation of federal law. So that is the difference. I think as the District Court explained below, in such a situation, when you have a defendant whose presence here is in violation of federal law, there are really only two options that the government has. From an administrative point of view, our option is to detain and remove. And from a criminal point of view, the option is to arrest and then prosecute. There really is no other choice. And this is at page 10 of the record. And so that is a difference. I guess I'm not clear on why do you say that. I mean, an alternative would be, I suppose, to, you know, let's say a Border Patrol agent came upon somebody who was undocumented. In theory, you could just issue that person a citation and process them through the CBB calendar, just like all other class B misdemeanors or less are processed. But I guess that's why I thought you were going to say that there's something different about the people who commit this particular offense as a class that justifies treating them differently. Perhaps because, I don't know, it makes no sense to give somebody a citation and to tell them to show up at a future court hearing when, you know, the vast majority of them don't have perhaps a permanent address in the United States. And that's why we need to arrest them. And if they're going to be released, at least have some kind of bond conditions imposed. Whereas the typical, you know, ticket, the person who gets a ticket for speeding isn't in that camp. That's the difference I thought you were going to describe. But you instead said there's something different about the nature of the offense. And that's what, I guess, confuses me. I apologize, Your Honor. So those are two separate points. But let me just address the point that you just raised. That is a valid point, one that the government raises in the papers. And the idea here is that, again, let's just contrast between somebody who's speeding in a national park versus somebody who enters illegally. Somebody's speeding in a national park, they get pulled over by a ranger. The ranger goes and asks them for their driver's license, asks them for their registration, gets their vehicle plate number. And so at this point, the government has a wealth of information. We know who you are. We know where you live. And if you don't show up to court, we know how to make you show up to court. I.e., we can send out a bench warrant. We can deny you a renewal of your driver's license. We can deny you registration of your car. The flip side of that is that for an alien who enters illegally, that person, we don't know who you are. We don't know where you live. And if you don't show up to court, there's very little we can do about it. And Your Honor is exactly right that these individuals, by and large, again, there are some rare exceptions, as pointed out by the appellants, that sometimes permanent residents get picked up for $13.25. But by and large, these individuals don't have permanent addresses here in the United States. Those individuals, again, don't have things like a driver's license or a vehicle registration, which the government can leverage in order to force that person to appear in court. And so that is another reason why we need to have the ability to arrest and then put through the bond process on such defendants. And this isn't just the government's position. This is the position of the magistrate judges who have reviewed 13.25 defendants and have made bond determinations. Uniformly, magistrate judges have required at least some form of bond. Sometimes the amount is as low as $1,000, as it was in the case of the appellants. Sometimes it's as high as $8,000 to $10,000. And sometimes a magistrate judge finds that there are no conditions of release that would reasonably assure the appearance of the defendants. So they order the defendant detained. And so there, in the process that we have right now, we arrest, we bring before a magistrate judge. There is a narrowly tailored, there is an individual determination of what kind of release this person should go through. And so that is a proper process. What is not proper is what is suggested by the appellants, that there is a blanket rule that every single 13.25 defendant encountered in the field is to be released on his or her own recognizance. Not a single magistrate judge that I've seen in the cases that I've reviewed has released, during a bond determination, a 13.25 defendant on his or her own recognizance. It doesn't make sense. And even the appellant's statistics prove that it doesn't make sense. This is a situation where, this is at page, I believe it's 42 of the record, where the appellants point to the statistic of 79 out of 299 of 13.25 defendants have absconded. They haven't shown up. And so we're talking about a failure to appear rate or an abscond rate of 26%, more than one in four. And this is an abysmal statistic. And this is with bond in place. And so we can imagine a situation, if we accept what the appellant's proposal is, this notion of, again, a blanket rule of release on own recognizance, that number has only one way to go, which is worse. And so, even from their own statistics, we can see that there is a definite need from the government to have some sort of system in place in order to have greater control over 13.25 defendants. And even with bond in place, the numbers are not good. And so, Your Honors, this covers, I think I've covered most of the reasons why the arrest of the individual, arrest of 13.25 defendants, is rational. So if there aren't any further questions, oh, I see my time is almost up. Your Honors, just with respect to bringing forth before a magistrate judge, that's required by federal rule. And with respect to countering the district court, that's completely irrational in the sense of judicial efficiency. So, Your Honors, if there are no further questions, the government submits. Okay. Thank you very much. Ms. Hartswell, you have some time for rebuttal. Let's get that up. Your Honor, just to go to the government's point about the failure to appear rate of people who are released on bond. The fatal flaw in the government's argument is that the failure to appear rate in petty offense court is worse. And yet the government does nothing about that. In fact, it is actually about almost 10% lower in petty offense court than it is for people on bond. And in fact, when people don't show up for a petty offense court, the government doesn't do anything about it. They don't send someone out. They don't arrest them. They don't do anything. So, any benefit that's gained from having someone's address or driver's license or anything like that doesn't do them any good because they don't actually enforce these offenses. In fact, in 12% of cases, even when a person in petty offense court doesn't show up, the magistrate dismisses the case anyway. So, the problem here is that the government is saying that it's... I'm not sure I see how that's an argument for sending 1325s to CBB because that would seem to suggest that the government would be rightly worried in the context of aliens who are not supposed to be in the country that they won't show up, they'll abscond, and that's not a good process given the statistics you just cited and that therefore there needs to be a different process. It seems to cut the other way, doesn't it? I would disagree, Your Honor, because I think the government is operating on this stereotype that people won't show up for their court because they were charged with this particular offense. But the statistics don't show that out in case... They actually show that people do show up 75% of the time. And in fact, if you look at Ms. Ayala... Maybe that's because they're not in CBB. If they went to CBB, then maybe they wouldn't show up. Well, the problem is that we don't know because the government has never put them in CBB. So... You just said the rates are so much higher in CBB of not showing up. All we have are the statistics that basically show that you can't judge whether someone is going to show up or not based on their alienage. And that's the point here, is that the government is assuming that because someone is an alien that they won't show up. And the statistics simply don't show that out. In fact, all we need to do is look at Ms. Ayala and Mr. Velez themselves. They showed up 8 out of 9 times. The only time they didn't show up is when they were in a car accident on the way to their hearing. And that's partly also because they were asylum seekers. They had an incentive to show up because they didn't want to get a 1325 conviction on their record that could hurt them. So, Your Honor, I think that the key question here is... Is the distinction on the basis of alienage... Thus, strict scrutiny applies, and the government has never attempted to satisfy strict scrutiny. It waived it below, it waived it on appeal, and therefore that's why they haven't carried their burden. Can I ask you one last question? Maybe you don't know the answer. Do you have any relevant comparative statistics from other districts? Or do other districts just all do it the same way that the Southern District of California does it? Statistics in terms of the... Does another district CVB all 1325 so that you can go and look and see what the experience is there? Or does everybody, all the border districts do it just the way... My understanding is all the border districts do it this way. I would also say, however, that there are quite a few districts where other people charged with 1325 and 1326 are released on bond. And in our excerpts of record, we show multiple declarations from other federal defenders saying that people on these charges do show up for their case. Okay, very good. Thank you very much for your arguments. The case just argued is submitted.
judges: Watford, Thapar, Collins